IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO TRANSIT AUTHORITY RETIREE HEALTH CARE TRUST and THE BOARD OF TRUSTEES FOR THE CHICAGO TRANSIT AUTHORITY RETIREE HEALTH CARE TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>DILWORTH PAXSON, LLP and TIMOTHY ANDERSON,<br><br>Defendants. | Case No. 19-cv-07570<br><br>Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs the Chicago Transit Authority Retiree Health Care Trust and the Trust's Board bring this action against Defendants Dilworth Paxson, LLP and Timothy Anderson, alleging negligence, aiding a breach of fiduciary duty, civil conspiracy and tortious interference with a contract. The defendants move to dismiss the complaint for lack of personal jurisdiction. For reasons stated herein, the Court denies the defendants' motion to dismiss.

**I. Background**

The following factual allegations are taken from the Complaint (Dkt. 1, Ex. B) and are accepted as true for the purposes of the motion to dismiss. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

1

The Chicago Transit Authority Retiree Health Care Trust (Trust) brings this action against the law firm Dilworth Paxson LLP and the attorney Timothy Anderson for torts related to their alleged involvement in the sale of fraudulent bonds. Dkt. 1, Ex. B ¶1. The Trust is a public pension fund established under Illinois law to provide healthcare benefits to retired employees of the Chicago Transit Authority. *Id.* at ¶7. Dilworth is a law firm operating with offices in the Northeast and Mid-Atlantic, and Anderson is a former partner of Dilworth's who lives in Pennsylvania. Dkt. 23 at 2-3. Dilworth does not employ any residents of Illinois. *Id.* at 2.

The Complaint alleges a complicated scheme, the ultimate outcome of which was the defrauding of the Trust and other pension funds of tens of millions of dollars. Dkt. 1, Ex. B ¶2. We limit our discussion here to the facts most relevant to the question of personal jurisdiction.

**A. The Scheme**

In 2009, the Trust entered into an investment agreement with Hughes Capital Management, a fixed-income investment manager with several pension fund clients. *Id.* at ¶19. The agreement stated that Hughes would not invest in high-risk or speculative securities. *Id.* at ¶20. Hughes did not have custody over any of the Trust's assets. *Id.* Instead, the Trust's assets were held at its bank, Northern Trust. *Id.*

Several years later, John Galanis, who had been previously convicted of larceny and was the subject of several SEC investigations, and his son Jason developed a plan to sell fraudulent bonds. *Id.* at ¶¶23-33. He and his partners would sell bonds issued by a sovereign tribal entity and, instead of investing the proceeds in the promised

2

assets, use the money as a personal slush fund. *Id.* at ¶33. They planned to sell bonds on behalf of the Wakpamni Lake Community, located in the Pine Ridge Reservation in South Dakota. *Id.* at ¶37. Burnham Securities would act as the placement agent for the bonds. *Id.* at ¶53. Burnham was owned by another corporation named CORFA, which was controlled by business associates of Galanis. *Id.* at ¶¶46, 50.

**B. Making the Sale**

Anderson, an experienced bond lawyer, was recruited by Galanis to represent Burnham in the bond sale. *Id.* at ¶¶35, 40, 54. According to the Trust, Anderson knew that the proposed bond had no real economic development purpose and was instead for Galanis's benefit. *Id.* at ¶52. Anderson acted as the "bond counsel" for the offering, preparing the documents and issuing an opinion letter on the validity of the transaction. *Id.* at ¶67.

In this role, he arranged in the summer of 2014 for U.S. Bank to serve as the indenture trustee for the bond offering. *Id.* at ¶100. The bank manager whose portfolio included South Dakota worked in the bank's Chicago office. *Id.* at ¶101. Anderson and the manager exchanged several emails and telephone calls discussing the terms of the deal. *Id.* at ¶¶103-12. Anderson allegedly took deliberate steps to hide Galanis's involvement in the deal from U.S. Bank. *Id.* at ¶¶107-08.

After U.S. Bank signed the indenture, however, it became clear that Galanis was having trouble finding purchasers for the bonds. *Id.* at ¶143. So, in August 2014, Galanis sought to gain control of Hughes Capital Management, in the hopes that he could then arrange for Hughes's clients to purchase the fraudulent bonds. *Id.* at

3

¶¶144-45. Hughes was purchased by one of CORFA's subsidiaries, so that Hughes and Burnham, the bond's placement agent, had the same ultimate ownership. *Id.* at ¶145.

After the purchase of Hughes, the investment advisor's employees were ordered to purchase the fraudulent bonds for their clients, including the Trust. *Id.* at ¶146. Hughes, however, did not have expertise in the particular type of bond sale involved in this transaction. *Id.* at ¶153. So, to ensure a timely closing, Anderson worked with Hughes's employees to purchase the bonds. *Id.* at ¶154. In that role he prepared documents specifically identifying a purchaser of the bonds as the "Chicago Transit Authority." *Id.* at ¶170.

On August 25, 2014, Anderson called a Northern Trust employee in Chicago about the Trust's purchase of the bonds. *Id.* at ¶181. He wanted to ensure that Northern Trust would be wiring the Trust's funds for the purchase and to obtain a fed wire reference number to close the transaction. *Id.* at ¶183. He also sent two emails to the employee later that day. *Id.* at ¶184. In response, the employee provided the fed wire reference number for the funds being transferred. *Id.* at ¶185. $4,073,499 was wired from the Trust's account in Chicago. *Id.*

After the funds were received, Jason Galanis, acting through Anderson, had them transferred to an account under his control. *Id.* at ¶¶227, 238. The Galanis family proceeded to use the money for payoffs, to support his businesses, and for personal expenses. *Id.* at ¶¶242-46.

**C. Criminal and Civil Consequences**

4

On May 9, 2016, the United States filed a criminal complaint in the Southern District of New York charging John and Jason Galanis and other associates with fraud related to the bond issuance. *Id.* at ¶301. The Trust learned that the bonds were fraudulent from this filing. *Id.* at ¶302. On January 19, 2017, Jason Galanis pleaded guilty to crimes related to his role in the bond offering. *Id.* at ¶307. On June 28, 2019, a jury found his father guilty as well. *Id.* at ¶312. On February 9, 2017, the Trust intervened in a civil lawsuit against Dilworth and Anderson filed by another bondholder, but the Trust's claim was eventually dismissed for lack of personal jurisdiction. *Id.* at ¶¶309, 315.

On August 18, 2019, the Trust filed this suit in the Circuit Court of Cook County. The defendants then removed the case to federal court.

**II. Standard**

Under Rule 12(b)(2), a court may dismiss a claim for lack of personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). A complaint need not include facts alleging personal jurisdiction. But once the defendant moves to dismiss the complaint under Rule 12(b)(2), the plaintiff must demonstrate that personal jurisdiction exists. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). When, as here, there has been no hearing on the matter, the plaintiff need only make a prima facia showing of jurisdiction. *Id*. At this stage, the Court takes all well-pleaded facts alleged in the complaint as true and resolves all factual disputes in the plaintiff's favor. *Id*.

Absent a federal statute specifying otherwise, personal jurisdiction is governed by the law of the forum state. Fed. R. Civ. P. 4(k)(1)(A). The Illinois long-arm statute extends jurisdiction as far as is permitted by the Fourteenth Amendment's Due Process Clause. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). The defendant need not have been physically present in the forum state for jurisdiction to satisfy due process. *Walden v. Fiore*, 571 U.S. 277, 283 (2014). Instead, "[t]he key question is . . . whether the defendants have sufficient 'minimum contacts' with Illinois such that the maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'" *Id.* at 700-01 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

### III. Analysis

Personal jurisdiction is established in one of two ways: general or specific jurisdiction. *Id.* In this case, neither party asserts that the Court has general jurisdiction over the defendants, so we turn to specific jurisdiction.

In evaluating whether it has specific jurisdiction over a defendant, the Court must find "three essential requirements." *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012).

> First, the defendant's contacts with the forum state must show that it "purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state." Second, the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities. And finally, any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice. *Lexington Ins. Co. v. Hotai Ins. Co., Ltd.*, 938 F.3d 874, 878 (7th Cir. 2019) (quoting *Felland*, 682 F.3d at 673).

When, as here, the plaintiff alleges intentional torts, the Court focuses on the "intentionally directed" part of the first element. *Tamburo*, 601 F.3d at 702. If all three elements are present, the Court may validly exercise jurisdiction.

### A. Anderson and Dilworth Have Purposefully Directed Their Activities at the State

We begin by considering whether Anderson and Dilworth purposefully directed their activities at Illinois. The intention of this element is to ensure that a defendant is not haled into court on account of contacts with the forum state that are "random, fortuitous, or attenuated." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Importantly, this assessment must be based on "contacts that the 'defendant himself' creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King*, 471 U.S. at 475). It is insufficient to point to the plaintiff's relationship to the forum state to satisfy the requirement. *Id*.

In *Campbell v. Campbell*, this Court found personal jurisdiction when a Minnesota defendant sent several allegedly defamatory emails to a third party living in Illinois. 262 F. Supp. 3d 701, 704 (N.D. Ill. 2017). The Court found that the defendant had purposefully directed his activities to Illinois because he sent the emails "specifically and . . . exclusively" to a person living in Illinois. *Id.* at 706. Similarly, in *Felland v. Clifton*, the Seventh Circuit found personal jurisdiction over an out-of-state defendant whose only contacts with the state were misleading emails, letters, and calls sent to the plaintiffs in Illinois regarding a fraudulent real estate development in Mexico. 682 F.3d 665, 671 (7th Cir. 2012). These communications were enough to

show purposeful direction because they were elements of a "comprehensive and ongoing scheme to perpetuate" the fraud. *Id.* at 675.

In the present case, the Trust alleges that Anderson, a partner at Dilworth, worked closely with the Trust's investment manager, Hughes, to execute the sale of bonds that he knew or should have known were fraudulent to the Trust. As part of that fraudulent sale, he made at least two separate contacts with Illinois. First, he telephoned and emailed an employee of U.S. Bank officed in Chicago to serve as an indenture trustee for the bond offering. Second, and more importantly, he exchanged emails and telephone calls with a Chicago-based employee of Northern Trust to obtain information necessary to execute the sale. Anderson's contacts with the U.S. Bank employee, which is not headquartered in Illinois, may well qualify as a "random" contact with the forum state, insufficient to grant personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). The same cannot be said for his contacts with Northern Trust.

Unlike the U.S. Bank employee, Northern Trust's presence in Illinois was not random, fortuitous, or attenuated. The plaintiff is located in and serves Illinois residents, as Anderson knew. That it would bank with a Chicago institution is, in fact, exactly what one would be expect. Furthermore, Anderson's contacts with the bank are similar to those found to constitute purposeful direction in *Campbell* and *Felland*. His communication with Northern Trust was critical to the successful execution of the sale. In that sense, they were in furtherance of the "comprehensive and ongoing" intentional torts of which the defendants are accused—civil conspiracy

8

and interference with fiduciary duty. And, like *Campbell*, the communication was specifically addressed to a resident of Illinois with the purpose of accomplishing the alleged torts.

The defendants argue this case is different from *Campbell* and *Felland* in that the communication in this case that provides the basis for jurisdiction was not directed at the plaintiff and it was not in-itself tortious. But *Walden* reminds us to focus on the defendant's contacts with the forum state, not whether they were directed at the plaintiff. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). And whether or not Anderson's communications with Northern Trust were tortious in itself, as alleged they were in furtherance of the civil conspiracy, just as the communications in *Campbell* furthered the fraud.

*Walden* is instructive. In that case, the Supreme Court found personal jurisdiction in Nevada lacking for a *Bivens* action against DEA agents who had seized cash in Georgia from a couple that were traveling back home to Nevada. *Id.* The Court dismissed the case because the alleged harm "is not the sort of effect that is tethered to Nevada in any meaningful way. Respondents . . . lacked access to their funds in Nevada not because anything independently occurred there, but because Nevada is where respondents chose to be." *Id.* at 290. But here, the Trust's funds are missing precisely because of Anderson's independent actions in Illinois. If Anderson had not reached out to Northern Trust, the funds would not have been transferred, and the Trust would not have been harmed. Anderson's activities thus constitute purposeful direction.

9

The defendants offer a further counterargument to a finding of purposeful direction. They cite *Medline Indus., Inc. v. Strategic Commercial Sols., Inc.*, a Northern District case where a defendant "directing" the withdrawal of funds from Illinois banks was deemed to not constitute purposeful direction. 553 F. Supp. 2d 979, 987 (N.D. Ill. 2008). Anderson's outreach to Northern Trust, by analogy, cannot be considered purposeful direction here.

Given subsequent circuit and Supreme Court cases, it is not clear that *Medline* is still good law. But even if it is, the case is not applicable here. In *Medline*, the defendant was contracted to provide customer service for a company engaged in fraud. In that role, the defendant *received calls from* people who banked in Illinois, but the defendant made no effort to actively direct themselves toward Illinois. Instead, they merely responded to incoming calls and passed the information on to the company. *Id.* at 983. That is a far cry from the direct, personal outreach alleged in this complaint. Anderson and Dilworth purposefully directed their activities at Illinois.

### B. The Trust's Alleged Injuries Arose from Anderson's Illinois-Related Activities

Next, we must determine whether the Trust's injuries arose out of the defendants' Illinois-related activities. When evaluating this element of specific jurisdiction, the Seventh Circuit has instructed the Court to focus on the "tacit quid pro quo that makes litigation in the forum reasonably foreseeable." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 430 (7th Cir. 2010). That is, "out-of-state residents may avail themselves of the benefits and protections of doing business in a forum state, but they

10

do so in exchange for submitting to jurisdiction in that state for claims arising from or relating to those activities." *Id.* This "more flexible inquiry" is not rooted in any mechanical test but instead focuses on foreseeability. *Faxel v. Wilderness Hotel & Resort, Inc.*, No. 19 C 4649, 2019 WL 6467317, at *3 (N.D. Ill. Dec. 2, 2019).

Dilworth and Anderson argue that it is not foreseeable that they would be subject to litigation in Illinois when none of Hughes, Burnham, Dilworth, or U.S. Bank were in Illinois. The defendants also say that the injury alleged was the result of Galanis's theft of retirement funds and so did not arise from Anderson's actions in Illinois. Both arguments fail because the defendants misconstrue the Trust's complaint.

The Trust alleges that Hughes and Burnham had the same ownership. Although employed by Burnham, Anderson worked with Hughes specifically to complete the sale of fraudulent bonds to the Trust, an Illinois public pension fund. Anderson prepared documents specifically intended to facilitate the sale of the bonds to the Trust, which he knew was located in Chicago, and he affirmatively reached out to the Trust's bank, also in Chicago, to ensure that the sale took place in the time required. Litigation arising from the course of conduct alleged in the complaint was foreseeable.

Similarly, even if Anderson's contacts with Illinois did not directly execute Galanis's ultimate theft of the bonds, the Trust alleges that Anderson knew of the fraudulent nature of the bond sale. So even if his contacts with Illinois did not result in directly stealing the funds, his contacts with Illinois facilitated their ultimate misappropriation. Litigation arising here was clearly foreseeable since the Trust's injuries arose from the defendants' Illinois-related activities.

11

### C. Exercising Jurisdiction Is Consistent with Fair Play and Substantial Justice

Finally, specific jurisdiction will only apply so long as it is consistent with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945). To make this determination, the Court looks to "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Tamburo v. Dworkin*, 601 F.3d 693, 709 (7th Cir. 2010) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). Once the previous two elements of specific jurisdiction have been established, "the defendant may avoid jurisdiction only if it 'presents a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Sunny Handicraft (H.K.) Ltd. v. Edwards*, No. 16 C 4025, 2017 WL 1049842, at *7 (N.D. Ill. Mar. 20, 2017) (quoting *Burger King*, 471 U.S. at 477).

Dilworth and Anderson have failed to present such a case. Illinois is the Trust's home forum, and so the Trust has a strong interest in obtaining relief there. *See Aon Corp. v. Cabezas*, No. 15-CV-04980, 2018 WL 1184728, at *7 (N.D. Ill. Mar. 7, 2018). Illinois, meanwhile, "has a strong interest in providing a forum for its residents and local businesses to seek redress for tort injuries suffered within the state and inflicted by out-of-state actors." *Tamburo*, 601 F.3d at 709; *see Felland v. Clifton*, 682 F.3d 665,

12

677 (7th Cir. 2012). The State's interest can only be heightened when the plaintiff is an institution created by state statute.

The defendants, meanwhile, will suffer a burden by being forced to litigate the case outside of their home state. But "[o]ut-of-state defendants always face a burden when defending an action in another state." *B-O-F Corp. v. AMF Sales & Assocs.*, No. 17-CV-07129, 2018 WL 4489505, at *5 (N.D. Ill. Sept. 19, 2018). To outweigh the plaintiff and state interest, Dilworth and Anderson must show that their hardship would be "greater than that routinely tolerated by courts exercising specific jurisdiction against nonresidents." *Felland*, 682 F.3d at 677. They have failed to do so. Accordingly, exercising jurisdiction in this case is fair and just. The case thus satisfies all the elements required for the Court to exercise specific personal jurisdiction.

### D. The Illinois Long-Arm Statute Covers the Full Extent Permitted by the Due Process Clause

The defendants' final argument is that, even if specific jurisdiction is permitted by the Due Process Clause, it is not permitted by the Illinois long-arm statute. In support, they cite a Northern District case that did not find personal jurisdiction in a similar case as the instant one because under "the long-arm statute . . .an economic loss which is felt in Illinois is not sufficient to confer jurisdiction in our courts when the acts occurred outside of Illinois." *Magnus v. Groner Apartments*, No. 86 C 734, 1986 WL 8970, at *2 (N.D. Ill. Aug. 14, 1986).

Since then, however, the long-arm statute has been modified to permit jurisdiction to the fullest extent allowed by the Due Process Clause. *Zazove v. Pelikan, Inc.*, 326

13

Ill. App. 3d 798, 807, 761 N.E.2d 256, 263 (2001). The defendants argue that the economic harm limitation survived the amendment, but the only citations they provide are to federal cases that are either apparently unaware of the statute's amendment, *Allman v. McGann*, No. 02 C 7442, 2003 WL 1811531, at *5–6 (N.D. Ill. Apr. 4, 2003), or mention the principle in dicta as part of a public-interest or fairness analysis. *McDonald's Corp. v. Bukele*, 960 F. Supp. 1311, 1320 n. 9 (N.D. Ill. 1997); *Sys. Software Assocs., Inc. v. Trapp*, No. 95 C 3874, 1995 WL 506058, at *7 (N.D. Ill. Aug. 18, 1995). The Court finds more persuasive the Illinois state courts that have treated the limitation as abrogated by the amendment. *See Zazove*, 326 Ill. App. at 807; *Kalata v. Healy*, 312 Ill. App. 3d 761, 245 Ill. Dec. 566, 728 N.E.2d 648 (2000). The Illinois long-arm statute allows personal jurisdiction to extend as far as is permitted by the Due Process Clause, including to this case.

### IV. Conclusion

For the stated reasons, the defendants' Motion to Dismiss is denied.

E N T E R:

Dated: November 2, 2020

*[signature: Mary M Rowland]*

MARY M. ROWLAND
United States District Judge

14